Fox Brothers Hardware Company *v.* Phillips.

4-7957                                   196 S. W. 2d 754

Opinion delivered October 14, 1946.

*Compere & Compere* and *Coleman & Gantt,* for appellant.

*Y. W. Etheridge,* for appellee.

Holt, J.   May 20, 1938, appellee, Mrs. Jessie Phillips, executed a mortgage in favor of Fox Brothers Hardware Company, mortgagee, in the amount of $987.99, on the following described lands in Ashley county, Arkansas: Frl. N½ NW¼ NW¼ NE¼ and NE part SE¼ NW¼, section 7, township 19 south, range 8 west, contain-

ing 135.84 acres." This mortgage was recorded May 21, 1938. Mrs. Phillips was the wife of L. M. Phillips, the brother of Ray Phillips. These two brothers were partners in the mercantile business, were involved in debt, and the above mortgage was executed by Mrs. Phillips as security for a debt which her husband and Ray Phillips, or Phillips Brothers, owed Fox Brothers Hardware Company.

Thereafter, on December 9, 1940, while the mortgage was in full force and effect, Mrs. Jessie Phillips executed her warranty deed for a consideration of $1,000 to Fox Brothers Hardware Company, grantee, covering the identical land embraced in the mortgage, *supra*. This deed was recorded December 16, 1940. At the time Mrs. Phillips executed this deed, Phillips Brothers had not paid its debt to Fox Brothers Hardware Company, which the mortgage had, as indicated, been executed by Mrs. Phillips to secure.

December 26, 1940, after Mrs. Phillips executed this deed, Fox Brothers executed in favor of Mrs. Jessie Phillips a written "Option to Purchase" the land described in the deed "on or before November 15, 1941, at and for the sum of one thousand eighty-six and 03/100 dollars ($1,086.03) plus six per cent. interest thereon from December 9, 1940." The option contained a provision, among other things, reserving to Fox Brothers Hardware Company "all oil, gas or other minerals upon said lands and the right to sell and execute oil, gas and other mineral leases on said lands or any part thereof at any time," in case the option should be exercised by Mrs. Phillips.

There was a further provision that: "If no demand be made on said Fox Brothers Hardware Company on or before said November 15, 1941, accompanied by tender of said cash payment of five hundred dollars, together with said promissory note for the balance aforesaid, this option shall on the day following said November 15, 1941, be automatically terminated without action on the part of either party hereto, time being of the essence of this agreement." It appears that no attempt was made by

Mrs. Phillips or by Phillips Brothers to exercise the option prior to its expiration date.

The transactions above enumerated between Mrs. Phillips and the Fox Brothers Hardware Company were handled on behalf of Mrs. Phillips through her husband, L. M. Phillips, and her brother-in-law, Ray Phillips.

It was the contention of appellee, Mrs. Jessie Phillips, in the trial court, that when she executed the deed, *supra*, she thought it was a mortgage given to secure the then outstanding debt of Phillips Brothers to Fox Brothers Hardware Company, and that she so intended it, and she asked that said deed be canceled and declared a mortgage. The court found the issues in favor of appellee, and this appeal followed.

The primary and decisive question presented for our determination is whether the warranty deed of Mrs. Jessie Phillips to Fox Brothers Hardware Company, December 9, 1940, was intended and accepted as a mortgage as found by the trial court?

The testimony discloses that Oscar L. Blackwell, one of the appellees, was a minor son of appellee, Mrs. Jessie Phillips, by a former marriage, and the land in question here was deeded to Mrs. Jessie Phillips by her former husband and father-in-law following a decree of divorce to Mrs. Phillips, September 19, 1932. By this decree, custody of the child was also awarded Mrs. Phillips.

We have before us the original deed and mortgage above referred to. Both appear to be regular and in the usual standard form. The entire deed (with the exception of the acknowledgment and certificate of record appearing on the back) is embodied on the front of one sheet of paper. At the top appears in large letters the words "Warranty Deed," and at the bottom the deed is signed by Mrs. Jessie Phillips.

At the time the deed was executed Mrs. Phillips was in a hospital, about to undergo a serious operation, and she testified: "On the day I was to be operated on, Ray brought the instrument to the hospital with a

notary public, and I signed it before her (the notary public) at the hospital just before I went on the operating table," and barely knew what she was doing; that she did not read the instrument and did not think she would have known what it was if she had read it. She had absolute confidence in her husband and his brother; "I knew what our agreement had been, that it should be a mortgage, and relied on it that the paper I signed was the mortgage we agreed upon. I thought I had a right to sign a mortgage to help prevent a lawsuit or bankruptcy or whatever bad might have resulted from failure to satisfy Fox Brothers." She had not discussed this matter with any agent of Fox Brothers Hardware Company before she signed the deed. She would not have signed the deed if she had known it was not a mortgage. She first learned that she had signed a deed and not a mortgage sometime in 1943, when she intended to lease the land for oil development.

Miss Jean Hopson, the notary public who took Mrs. Phillips' acknowledgment to the deed, testified as to Mrs. Phillips' condition at the time: "I was present and saw Mrs. Jessie Phillips sign the said deed as grantor, otherwise I would not have signed the acknowledgment; also I would not have signed the acknowledgment had I not thought that she knew what she was doing at the time. Had there been any unusual circumstances in connection with this acknowledgment they would have made a definite impression upon me, and if there had been anything in the appearance or conversation of Mrs. Phillips which would indicate she did not understand the nature of the transaction, I would not have taken her acknowledgment."

At the time of the execution of this deed, absolute on its face, the mortgage, *supra,* executed May 20, 1938, was in full force and effect.

As this court said in *Anderson* v. *Powell,* 146 Ark. 87, 225 S. W. 24, "In determining whether an instrument, absolute upon its face, was intended by the parties as a mortgage, the court 'will consider the circumstances of the parties, the property conveyed, its value, the price paid for it, defeasances, verbal or written, as well as the

acts and declarations of the parties.' *Scott, White & Co.* v. *Henry & Cummingham,* 13 Ark. 112. In the application of this test to the evidence in a given case, it is necessary to indulge the presumption that a deed is what it purports to be on its face, and that the burden rests upon one asserting otherwise to overcome the presumption by clear, unequivocal and convincing evidence. *Gates* v. *McPeace,* 106 Ark. 583, 153 S. W. 797.''

In *Clark-McWilliams Coal Co.* v. *Ward,* 185 Ark. 237, 47 S. W. 2d 18, this court again announced the rule in this language: ''The presumption arises that the instrument is what it purports to be; and, to establish its character as a mortgage, the evidence must be clear, unequivocal and convincing. By this is meant that the evidence tending to show that the transaction was intended as a security for debt, and thus to be a mortgage, must be sufficient to satisfy every reasonable mind without hesitation.''

In Vol. 1 (8th ed.), Jones on Mortgages, p. 416, § 329, the text writer says: ''Payment of taxes by the grantor after execution of a deed is further evidence that it was not intended as an absolute conveyance, but merely as a mortgage; while payment of taxes by the grantee indicates that he regarded himself as owner, and negatives the idea of a mortgage.''

With the above well-established rules of law in mind, and after a careful review of the testimony presented by this record, we have reached the conclusion that appellees have failed to meet the test, or burden of proof, imposed upon them and that the trial court erred in holding otherwise.

There are many significant facts that stand out in this record.

At the time the deed was executed, Phillips Brothers had not paid their debt to appellant and the 1938 mortgage which Mrs. Phillips had executed as security for this debt was still outstanding and had not been satisfied. Immediately following the execution of the deed, appellant, Fox Brothers, placed it of record and made

a written request to the collector of Ashley county to transfer ownership of the land on the tax books from Mrs. Phillips to Fox Brothers Hardware Company. This was done, and thereafter, since 1940, all taxes accruing on the land have been paid by Fox Brothers without any attempt, so far as the record discloses, on the part of Mrs. Phillips to pay these taxes. It is also significant that the "Option to Purchase" executed by appellant at approximately the same time the deed was executed contained a provision reserving to appellant all oil, gas and mineral in and on this land.

Just why it was necessary for Mrs. Phillips to execute a second mortgage in favor of appellant approximately two and one-half years after the first mortgage on identically the same land, securing the same debt, is not satisfactorily explained.

"One of the recognized tests on the issue of mortgage or no mortgage is the relationship between the consideration for the conveyance and the actual value of the property conveyed," *Newport* v. *Chandler,* 206 Ark. 974, 178 S. W. 2d 240, 155 A. L. R. 1096.

On this question as to the value of the land at the time the deed in question was executed, December 9, 1940, we think the preponderance of the testimony supports appellant's contention that its value at that time was approximately $1,000.

On behalf of appellant, the testimony of F. L. Parsons, R. E. Farrar, Thomas Compere and Wm. C. Norman, all familiar with the land here involved and land values in the vicinity, was to the effect that this tract of land was worth approximately $1,000 December 9, 1940, when the deed was executed.

On behalf of appellees, two witnesses, Mrs. Phillips and L. L. Morris, testified on land values. Mrs. Phillips testified: "Q. When did you first learn that you had signed a deed and not a mortgage? A. Sometime in 1943, when I intended to lease the land for oil development. I learned then that I had signed a deed and not a mortgage. . . . Q. Now, going back to the oil lease. What

price were you offered per acre for a lease on the land for oil and gas development? A. I was offered $5,000 for a lease on the land if I could get the title back to the land from Fox Brothers. Q. Have you been offered any price for the land since this controversy has come up? A. Yes, sir, I have been offered $8,000."

It would appear from this testimony that Mrs. Phillips does not confine her estimate of values to the time when she executed the deed in question, December 9, 1940. We think a fair inference to be drawn from this testimony is that she was testifying as to values subsequent to 1943, after land values had appreciated on account of oil developments.

Appellees say in their brief: "What was the value of the land? L. L. Morris, the only competent witness who has testified, states that it was worth about $5,000 due to its proximity to Crossett, a closed town." The record reflects that this witness testified on August 30, 1944. We quote from his testimony: "Q. Are you familiar with land values in Ashley county, particularly in the neighborhood of the (land in question here)? A. Yes. Q. Are you familiar with the market value of land similar to this land and similarly located, taking into consideration the timber on it, its location, and like qualities? A. Yes. Q. What would you say is the fair market value of this particular 135.84 acres of land, taking those elements into consideration? A. I would say from $25 to $30 per acre. If cut up into small tracts, it would sell for a better price in view of its nearness to Crossett, a closed town, I would say from $40 to $50 per acre. I would say two-thirds of the land would be suitable for this purpose. Q. What would you say the oil rights, lease and royalties would be worth on this land? A. There is no wild-cat development going on in that neighborhood now and one could hardly sell a lease. Last winter, when there was such development, she should have sold a lease for approximately $5 per acre, and half royalties from $5 to $25 per acre."

We think that a fair deduction from this testimony is that Mr. Morris was not testifying as to land values on

December 9, 1940, when the deed in question was executed, but values subsequent thereto.

Nor do we find any evidence of fraud on the part of appellant in this case. If appellee's husband and her brother-in-law, while acting as her agents, practiced a fraud upon her and by misrepresentations induced her to sign an instrument which she thought was a mortgage, these acts on the part of her agents certainly could not be charged to appellant who was not a party to such fraud and deception, and, as we read the evidence, had no knowledge thereof.

For the reasons stated, the decree is reversed, and the cause remanded with directions to dismiss appellees' complaint for want of equity.